**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| KEITH CONLON,<br><br>                    Plaintiff,<br><br>          v.<br><br>BP LUBRICANTS USA, INC.,<br><br>                    Defendants. | Civil Action No. 22-6755 (JXN)(LDW)<br><br><br>**AMENDED OPINION** |

**NEALS**, District Judge

Before the Court is Defendant BP Lubricants USA, Inc.'s ("BP"[1]) motion for summary judgment pursuant to Federal Rule of Civil Procedure[2] 56. (ECF No. 69.) Plaintiff Keith Conlon ("Plaintiff") opposed the motion (ECF No. 72), and BP replied in further support (ECF No. 74). The Court has subject-matter jurisdiction under 28 U.S.C. § 1332. Venue is proper pursuant to 28 U.S.C. § 1391. The Court has considered the parties' submissions and decides this matter without oral argument pursuant to Rule 78 and Local Civil Rule 78.1. For the reasons set forth below, BP's motion for summary judgment is **GRANTED**.

**I.     BACKGROUND**[3]

**A.     BP Reinvent**

BP, headquartered in Wayne, New Jersey, distributes automotive lubricants, including a suite of Castrol-brand products. (DSMF ¶ 1.) Plaintiff was born in 1963 and is currently sixty-one

---

[1] "BP Lubricants" is another name for Castrol. (*See* Pls.' Counterstatement of Facts ("PCSF") ¶ 3, ECF No. 72-2.) For the sake of uniformity, the Court refers to "Castrol," "GBS," "BP's parent company," and/ or "BP Lubricants" as simply "BP."

[2] "Rule" or "Rules" hereinafter refer to the Federal Rules of Civil Procedure.

[3] The facts derive from Defendant's Statement of Undisputed Material Facts ("DSMF") (ECF No. 70-1), Plaintiff Counter Statement of Facts ("PSMF") (ECF No. 72-2), Plaintiff's Response to Defendant's Statement of Facts ("PRSMF") (ECF No. 72-1), and Defendant's Response to Plaintiff's Counter Statement of Facts ("DRSFM") (ECF

years old. (PSMF ¶ 1.) BP employed Plaintiff from 1993 until his termination on October 13, 2023. (DSMF ¶ 2.) Plaintiff held various roles at BP, including financial analyst, a sales position, and various marketing roles, including a marketing position following a company-wide restructuring known as BP Reinvent ("Reinvent"). (PSMF ¶¶ 4–13.) Reinvent was announced in February 2020. (*Id.* ¶ 25.) Reinvent was expected to reduce employee headcounts across BP's parent organization by approximately 25%, or roughly 10,000 employees. (DSMF ¶ 23.) To support the reorganization, BP employees were classified into tiers based on their rank within the company, with Tier 1 being the highest. (*Id.* ¶ 24.) Plaintiff was classified as a Tier 4 employee.[4] (*Id.* ¶ 25.) Employees in Tier 3 and below ("Eligible Employees") were eligible for new roles in the reorganization through Reinvent's selection process ("Selection Process"). (*Id.* ¶¶ 26–31.) Employees in the Early Career Program, a developmental program for recent college graduates, were ineligible for the Selection Process. (*Id.* ¶¶ 27–28.)

In July or August 2020, prior to Reinvent's implementation, BP held a strategy event where Director Laura Posadas delivered a PowerPoint presentation stating: "47% 50+ great risk to knowledge and experience leaving organization. Need for feeder talent and succession plan. Sales & FGT higher areas of key importance." (DSMF ¶¶ 69–73; Pl.'s Ex. 2 at *259,[5] ECF No. 72-3.)

To assist with the Selection Process, Eligible Employees were "encouraged to complete a 'My Profile' to help BP understand each employee's experiences, interests, and aspirations." (DSMF ¶ 33.) Employees were further "encouraged to have their My Profile reflect their

---

No. 73-2), along with the supporting documents to this pending motion. For brevity, all citations to the parties' Rule 56.1 statements incorporate the evidentiary citations contained therein.

[4] The parties did not specify the number of tiers in the company as referenced by the Transcript of the May 7, 2024 Deposition of Laura Posadas, "I would never remember hearing past Tier 4. It always said Tier 4 plus. I don't think there was ever a number given." (Ex. D at 8.)

[5] Pincites preceded by an asterisk (*) use ECF pagination.

knowledge, skills, experiences and aspirations." (*Id.* ¶ 34.) Plaintiff's "My Profile" stated, in part, "My diverse background in Finance, Sales and Marketing (Brand & Trade) provides me with an excellent foundation to succeed in various functions within BP" and listed a "Marketing Role" among his three- to five-year goals. (*Id.* ¶¶ 35–36.) From September to October 2020, each Eligible Employee was scored by their manager using criteria that incorporated their My Profile, past performance reviews, professional history, and career aspirations. (PSMF ¶¶ 42–43.) In October 2020, this culminated in a series of panel review meetings to decide how employees would be placed after Reinvent. (DSMF ¶¶ 39–40.) Panel decisions were then submitted for higher-level approval. (*Id.*)

Guidelines disseminated to BP management in connection with the Selection Process stated that employees' age and retirement eligibility, amongst other factors, should not be considered in selection decisions. (*Id.* ¶ 44.) During the Selection Process, managers considered providing developmental opportunities for employees, established a handover process to prepare the new employee taking over a role, and sought to diversify BP's teams by hiring employees with different professional experiences. (*Id.* ¶¶ 42–43.) BP required a "neutral observer" to attend panel review meetings with the stated goal of maintaining impartiality and avoiding bias. (*Id.* ¶¶ 45–47.) .

### B.    Leave of Absence

On December 1, 2020, following the Selection Process, Plaintiff was laterally transferred from his position as National Account Manager–SAPD to Senior Trade Marketing Manager in BP's marketing department, reporting to his new manager, Rayne Pacek ("Pacek"). (PSMF ¶ 65; *See* Third Am. Compl. ¶ 30, ECF No. 39.) Afterwards, Frank Parzynski, an employee "in his twenties" with "[six] years of experience with BP," filled Plaintiff's previous role. (PSMF ¶¶ 58–59; DSMF ¶ 59.) As part of joining the marketing team, Plaintiff commuted to BP's Wayne, New

Jersey office around once a week and was responsible for directly managing other employees. (PSMF ¶¶ 68, 74-75.) Several of Pacek's direct reports complained about how she treated them, including Plaintiff and a female employee in her twenties. (DSMF ¶ 76.)

Beginning on July 11, 2022, Plaintiff took a medical leave of absence and concurrently requested short-term disability ("STD") benefits for a qualified disability. (*Id.* ¶ 79.) BP's STD Plan offers paid leave to employees who are ill, injured, or unable to work. (*Id.* ¶ 80.) Under the STD Plan, however, benefits are discretionary. (*Id.* ¶ 81.) Sedgwick, the third-party administrator BP uses to make STD benefit coverage determinations, notified Plaintiff that his leave and short-term disability benefits were approved from July 11, 2022, through August 2, 2022. (*Id.* ¶¶ 82, 88.) Plaintiff was told that he must provide updated medical documentation by August 15, 2022, to extend his approved leave of absence and, as such, submitted the required medical documentation. (*Id.* ¶¶ 86–90; Third Am. Compl. ¶¶ 45–46.)

On September 6, 2022, Sedgwick sent Plaintiff a letter indicating that, based on a review of the office visit notes from his healthcare provider, there was a "lack of supporting medical information and conflicting medical information," which led them to conclude that he did "not qualify for [STD] benefits . . . beyond August 2, 2022." (DSMF ¶¶ 92–94; Def.'s Ex. A at *59, ECF No. 70-3.)

Although Sedgwick ultimately did not approve paid STD benefits beyond August 2, 2022, it approved and extended Plaintiff's unpaid medical leave through September 19, 2022. (DSMF ¶ 95.) Because BP's practice was to pay employees while Sedgwick's STD coverage determination was pending, Plaintiff continued to receive STD payments after August 2, 2022, totaling $19,099.87. (*Id.* ¶¶ 95, 97.) BP contacted Conlon seeking his return of the $19,099.87 in late 2022 and early 2023. (*Id.* ¶ 98.) Plaintiff appealed the STD decision on January 30, 2023, and filed an

internal complaint alleging that the demand for repayment was retaliatory due to his age, disability, and taking medical leave. (PSMF ¶¶ 84–86.) He has not repaid the overpayment amount to BP. (DSMF ¶ 99.)

BP's Annual Cash Bonus Policy provides: "For employees who have periods of unpaid leave during the performance year, the calculation shall be prorated to exclude the number of calendar days of that unpaid leave." (*Id.* ¶ 101.) Based on Plaintiff's period of unpaid leave from August 3, 2022, to September 19, 2022, BP reduced his 2022 annual cash bonus by $7,451, from $56,668 to $49,217. (*Id.* ¶ 100.) The previous year, Plaintiff received a $54,676 annual cash bonus. (*Id.* ¶ 67.)

Plaintiff returned to work on September 20, 2022. (PSMF ¶ 80.) While he was on leave, BP terminated Pacek. (DSMF ¶ 96.) Also in September 2022, BP adopted a policy requiring office-based employees to work onsite three days per week; after Plaintiff returned, he submitted a written request to work remotely four days per week as a medical accommodation. (*Id.* ¶¶ 102–03.) Plaintiff's new manager granted the request in September 2022, and BP formalized it in writing on October 5, 2023. (DSMF ¶¶ 104, 106.)

### C.    Fraud Detection

Beginning in at least 2019, BP employees were "expected to make work-related purchases using their corporate credit card, through Citibank, and then submit those expenses through the Concur expense platform." (*Id.* ¶ 108.) After management approved the expense, BP paid the credit card bill directly to Citibank. (*Id.* ¶ 109.) If an employee "made a work-related purchase using cash, the employee would submit that purchase through the Concur expense platform, and, once approved, the employee would receive reimbursement from BP." (*Id.* ¶ 110.) BP employees were

5

not permitted to use their corporate credit card for personal expenses; if they did, BP "expected the employee to pay for the purchase to Citibank directly." (*Id.* ¶¶ 111–12.)

In February 2022, BP began using a computer-based fraud detection tool to review employees' work-related expense reports dating back to 2019. (*Id.* ¶¶ 107–08.) BP's fraud detection tool identified certain transactions as potentially noncompliant with company policy and assigned each employee a risk score ranging from 0 to 999, with higher scores indicating greater potential noncompliance. (*Id.* ¶¶ 115–16.) The tool flagged eleven of Plaintiff's expense reports ("Allegedly Fraudulent Transactions") where it appeared Plaintiff "had submitted receipts for cash reimbursement (to be paid directly to him) after the same expense had already been submitted and/or paid by [BP] as a corporate credit card expense (which would be paid directly to the credit card company)." (*Id.* ¶ 119.) The flagged transactions totaled $1,418.89, and the fraud detection tool assigned Plaintiff a risk score of 900. (*Id.* ¶¶ 118–19; Def.'s Ex. B ("Investigation Report") ¶ 5, ECF No. 70-9.)

### D.    Litigation Begins

On November 15, 2022, Plaintiff filed a Charge of Discrimination against BP with the Equal Employment Opportunity Commission ("EEOC"). (*Id.* ¶ 113.) Later that month, Plaintiff sued BP in this Court, seeking damages for discrimination and retaliation pursuant to the New Jersey Law Against Discrimination, N.J.S.A. § 10:5- 1, *et seq.* ("LAD"), and the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq.* ("FMLA"). (*See* Compl, ECF No.1.) On March 17, 2023, the EEOC issued Plaintiff a notice of dismissal and of Plaintiff's right to sue. (*See* Am. Compl. Ex. B, ECF No. 19.)

E.    **The Fraud Investigation Begins and Ends**

Due to the litigation, BP placed a "legal hold" on any investigation into the Allegedly Fraudulent Transactions. (PSMF ¶ 96.[6]) J.D. Serrano ("Serrano"), a BP Investigation Manager, was assigned to investigate the matter in April 2023. (*Id.* ¶ 100.) Serrano interviewed Plaintiff regarding the Allegedly Fraudulent Transactions on May 17, 2023, and July 7, 2023. (DSMF ¶ 126.)

When asked about why Plaintiff submitted cash expense reports for identical credit card charges, Plaintiff claimed he did so, in many instances, to "reconcile" his Concur account; according to Plaintiff, the credit card charges remained on his account despite having submitted expense reports. (*See id.* ¶¶ 136, 157, 162, 170, 178, 187.) However, Serrano found that the credit card charges had been paid to Citibank before Plaintiff requested cash reimbursement. (*Id.* ¶ 194.) Serrano concluded that all the Allegedly Fraudulent Transactions violated BP's code of conduct. (*Id.* ¶ 195.)

BP assigned a group, including employees from Ethics and Compliance, Human Resources, Investigations, and Vice President Ana Del Rey ("Del Rey"), to determine what discipline, if any, Plaintiff would receive in connection with Plaintiff's investigation. (PSMF ¶ 129.) As the ultimate decisionmaker, Del Rey agreed with the group's recommendation to

---

[6] BP argues the Court cannot consider this assertion because the evidence upon which it relies is unauthenticated. (*See* DRSMF ¶ 96.) The evidence upon which that assertion relies is an email Serrano sent acknowledging there was, at one point, a hold (*see* Pl.'s Ex. 21, ECF No. 71-5), and Serrano's deposition testimony wherein he stated the same (*see* Def.'s Ex. H ("Serrano Dep.") at 183:14–188:13, ECF No. 72-4). "[A] court in assessing opposition to a motion for summary judgment might consider unauthenticated documents or hearsay provided that the evidence could be made admissible at trial." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 295 n.66 (3d Cir. 2014). Serrano, who wrote the email, could authenticate it at trial. In any event, the burden of authentication under Federal Rule of Evidence 901 "is slight." *Lexington Ins. Co. v. W. Pa. Hosp.*, 423 F.3d 318, 328 (3d Cir. 2005) (quoting *McQueeney v. Wilmington Trust Co.*, 779 F.2d 916, 928 (3d Cir. 1985)). The BP Bates stamps on the email "indicate that they were produced by [BP] during discovery, which is also probative on the issue of authentication." *Lowe v. Medco Health Sols. of Willingboro, LLC.*, No. 10-4823, 2012 WL 1495440, at *2 n.5 (D.N.J. Apr. 27, 2012).

terminate Plaintiff's employment. (DSMF ¶ 226.) BP fired Plaintiff on October 13, 2023. (*See id.* ¶ 2.)

###### F.    Litigation Continues

On November 2, 2023, Plaintiff filed another Charge of Discrimination against BP with the EEOC. (*Id.* ¶ 113.) On January 2, 2024, the EEOC issued another notice of dismissal of the claim and notice of Plaintiff's right to sue. (*See* Third Am. Compl. ¶¶ 16–17.)

Plaintiff filed a Third Amended Complaint[7] on January 16, 2025, which includes claims under the Age Discrimination in Employment Act, as amended, 29 U.S.C. § 621, *et seq.* ("ADEA"); the Americans with Disabilities Act, as amended, 42 U.S.C. §12101, *et seq.* ("ADA"); the LAD; and the FMLA. (*See generally id.*)

On June 16, 2025, BP moved for summary judgment, arguing that (1) Plaintiff's hostile work environment claim fails because he lacks evidence of severe or pervasive harassment; (2) Plaintiff's ADEA claim is time-barred; (3) Plaintiff's disability discrimination claims fails to satisfy the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973); and (4) Plaintiff's retaliatory discharge claims similarly fall short of the proof required under the *McDonnell Douglas* framework. (Def.'s Moving Br., ECF No. 70.) Plaintiff opposed (Pl.'s Opp'n, ECF No. 72), and BP replied in further support (Def.'s Reply, ECF No. 74). This motion is now fully briefed and ripe for the Court to decide.

---

[7] The Complaint was amended three times, June 5, 2023 (ECF No. 19), December 4, 2023 (ECF No. 33), and January 16, 2025 (ECF No. 39). The First Amended Complaint was amended to incorporate claims under the ADEA and ADA that first needed to be exhausted with the EEOC. Plaintiff filed a Second Amended Complaint incorporating additional claims of discrimination and retaliation under state law relating to his termination. Plaintiff's Third Amended Complaint now incorporates additional claims of discrimination and retaliation under federal law relating to his termination.

## II.    LEGAL STANDARD

Rule 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The substantive law identifies what facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact raises a "genuine" dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Borough of West Chester*, 891 F.2d 458, 459 (3d Cir. 1989) (citation omitted).

The Court must consider all facts and their logical inferences in the light most favorable to the non-moving party. *See Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986). The Court will not "weigh the evidence and determine the truth of the matter," but will determine whether a genuine dispute necessitates a trial. *Anderson*, 477 U.S. at 249. The Court also will not "resolve factual disputes or make credibility determinations." *Rhodes v. Marix Servicing, LLC*, 302 F. Supp. 3d 656, 661 (D.N.J. 2018) (quoting *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir. 1995)). Although the moving party bears the initial burden of showing the absence of a genuine dispute of material fact, meeting this obligation shifts the burden to the non-moving party to "set forth specific facts showing that there is a genuine [dispute] for trial." *Anderson*, at 250. The Court must grant summary judgment if the non-moving party fails to demonstrate proof beyond a "mere scintilla" of evidence that a genuine dispute of material fact exists. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992) (citation omitted). Furthermore, "a party does not raise a genuine [dispute] of material fact by speculation

9

and conclusory allegations." *Dunkin' Donuts Inc. v. Patel*, 174 F. Supp. 2d 202, 210 (D.N.J. 2001) (citation omitted)

## III.    **DISCUSSION**

### A.    **Hostile Work Environment**

To prevail on an age-based hostile work environment claim under the ADEA,[8] Plaintiff must show (1) he "suffered intentional discrimination because of" his age, (2) the discrimination was "severe or pervasive," (3) the discrimination "detrimentally affected" Plaintiff, (4) the discrimination "would detrimentally affect a reasonable person in like circumstances," and (5) "*respondeat superior* liability." *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013). The hostile work environment analysis under NJLAD is "strikingly similar." *Grazioli v. Genuine Parts Co.*, 409 F. Supp. 2d 569, 576 n.10 (D.N.J. 2005).

Plaintiff alleges BP "subject[ed] him to a hostile work environment" because of his age. (Third Am. Compl. ¶ 102.) Specifically, Plaintiff asserted that, after his transfer, "Pacek provided [him] with minimal training, assigned him deadlines that were unreasonable, unjustly criticized his work effort, and at times even cancelled face-to-face meetings after [he] made the 5-hour commute to be physically present for the same." (PSMF ¶ 77.)

But Plaintiff fails to prove Pacek mistreated Plaintiff *because of* his age. Plaintiff must show "some causal connection between [his] membership in a protected class and [his] alleged mistreatment." *Nardella v. Phila. Gas Works*, 621 F. App'x 105, 107 (3d Cir. 2015). "Sometimes, the but-for causation element may be established by the nature of the harassment itself." *DeSantis*

---

[8] The Court notes that the Third Circuit "has not yet determined" that a hostile work environment claim can be made under the ADEA, but "has on a number of occasions assumed *arguendo* that a hostile work environment claim can go forward under the ADEA." *Adams v. City of Newark*, 747 F. Supp. 3d 721, 731–32 (D.N.J. 2024). The Court follows suit.

*v. N.J. Transit*, 103 F. Supp. 3d 583, 594 (D.N.J. 2015). For instance, "an allegation of racial harassment may be found adequate where it is based on racist, or at least racial, comments or epithets." *Id.* In other cases, "but-for causation element may be established by temporal proximity—for example, protected conduct that is closely followed by an adverse action." *Id.* But, at a minimum, "there needs to be some allegation that demonstrates the requisite discriminatory tinge" to the complained-of conduct. *Williams v. Hershey Co.*, No. 20-9394, 2021 WL 1686568, at *4 (D.N.J. Apr. 29, 2021).

None of the complained-of conduct has a "discriminatory tinge." Plaintiff alleges Pacek cancelled meetings despite Plaintiff commuting hours to the office (Pl.'s First Dep. 115:14–19, ECF No. 69-4); was dismissive (*Id.* at 116:12–14); said that "some people work at 70 percent capacity and some people work at 100 percent capacity" (*id.* at 116:20–21); asked Plaintiff "to assess an employee that worked for [him]" (*id.* at 117:17–18); and said she felt like "she was being blind-sided" when Plaintiff took a leave of absence (*id.* at 118:23–24). None of Pacek's conduct, however unjustified, has any apparent connection to Plaintiff's age. In fact, Plaintiff testified that Pacek never said "anything about [Plaintiff's] age." (*Id.* at 123:18–20.) And although Plaintiff states he believed Pacek treated him poorly because of his age, Plaintiff's "personal belief as to why something happened is insufficient, unless it is accompanied by other evidence." *Adams*, 747 F. Supp. 3d at 734. Plaintiff, moreover, testified that Pacek treated Plaintiff's other, younger, coworkers in a similar manner. (*Id.* at 125:4–15.) Thus, far from Pacek's conduct being tinged with discriminatory animus, she mistreated her employees regardless of age. Because federal and state antidiscrimination laws are not a "general civility code," and Plaintiff describes only general, nondiscriminatory conduct, his hostile work environment claims fail as a matter of law. *Faragher*

11

*v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citation omitted). The Court, therefore, **grants** BP's motion for summary judgment as to Plaintiff's hostile work environment claims.

### B. Age Discrimination

#### i. *The ADEA Claim is Time-Barred*

Summary judgment is "an appropriate stage to examine whether claims are barred by the applicable statute of limitations." *Cascina v. Hackensack Univ. Med. Ctr.*, No. 19-17571, 2021 WL 4490249, at *3 (D.N.J. Oct. 1, 2021). Defendants argue that Plaintiff's ADEA claims are time-barred. The ADEA requires "an aggrieved party to file a complaint with the EEOC within [three hundred] days after the occurrence of the alleged unlawful employment practice." *Id.* (citations omitted). "A discrete retaliatory or discriminatory act 'occurred' on the day that it 'happened.'" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002). "A party, therefore, must file a charge within . . . [three hundred] days of the date of the act or lose the ability to recover for it." *Id.* "Each discrete discriminatory act starts a new clock for filing charges alleging that act." *Id.* at 113.

Plaintiff submitted his initial EEOC complaint on November 15, 2022. (Third Am. Compl. ¶ 11.) Consequently, any discriminatory act occurring before January 19, 2022, is time-barred. Plaintiff then filed a second EEOC complaint on November 3, 2023. (*Id.* ¶ 16.) Any discriminatory act occurring before January 7, 2023, is similarly time-barred. In sum, Plaintiff can recover only for discrete discriminatory acts occurring between January 19, 2022, and November 15, 2022; and between January 7, 2023, and November 3, 2023. Because Plaintiff's transfer occurred in April 2021 (*see* DSMF ¶ 66), he cannot recover for it under the ADEA as a discrete discriminatory act. Thus, to the extent Plaintiff alleges age discrimination under the ADEA, that claim fails as a matter of law.

### ii.    The Age Discrimination Claim Fails on the Merits

Both the ADEA and NJLAD evaluate age discrimination claims under the *McDonnell Douglas* framework. *Lawrence v. Nat'l Westminster Bank N.J.*, 98 F.3d 61, 65 (3d Cir. 1996) (quoting *Sempier v. Johnson & Higgins*, 45 F.3d 724, 728 (3d Cir. 1995)). Plaintiff must first establish a *prima facie* case of age discrimination by showing he was: (1) over the age of forty, (2) subject to an adverse employment action, (3) qualified for his position, and that (4) the adverse employment action was because of his age. *Fowler v. AT&T, Inc.*, 19 F.4th 292, 299 (3d Cir. 2021). Plaintiff must show "age was the 'but-for' cause of the challenged adverse employment action." *Reich v. Schering Plough Corp.*, 399 F. App'x 762, 764 (3d Cir. 2010).

Next, "the burden shifts to defendant to articulate a 'legitimate nondiscriminatory' reason for the adverse employment decision." *Lawrence*, 98 F.3d at 66. If the defendant articulates a legitimate nondiscriminatory reason, "[t]he plaintiff then has the opportunity to demonstrate that the employer's stated reasons were not its true reasons but were a pretext for discrimination." *Sempier*, 45 F.3d at 728. The plaintiff may do so "either: (1) by discrediting the proffered reasons for termination, directly or circumstantially, or (2) by adducing evidence that discrimination was more likely than not a motivating or determinative cause of the adverse action." *Lawrence*, 98 F.3d at 66.

Plaintiff's age discrimination claim fails at the first step. To be sure, Plaintiff was over the age of forty when he was transferred. But Plaintiff's transfer was not adverse. An employment action is adverse when it is "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Walker v. Centocor Ortho Biotech, Inc.*, 558 F. App'x 216, 219 (3d Cir. 2014) (quoting *Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004)). "Minor actions, such as lateral transfers and changes of title and reporting

13

relationships, are generally insufficient to constitute adverse employment actions." *Langley v. Merck & Co.*, 186 F. App'x 258, 260 (3d Cir. 2006). In other words, Plaintiff "must show some harm respecting an identifiable term or condition of employment." *Muldrow v. City of St. Louis*, 601 U.S. 346, 355 (2024). *See also Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) (noting that "bruised ego," "demotion without change in pay, benefits, duties, or prestige," or "reassignment to more inconvenient job" not adverse employment action).

Plaintiff argues that the transfer was adverse because (1) his responsibilities changed and (2) he lost access to a company car and his old bonus structure. To be sure, the scope of Plaintiff's work changed. Before, he worked in sales in a "direct" sales channel and did not oversee employees; after the transfer, he worked in digital trade marketing in an "indirect" sales channel and oversaw employees. (PSMF ¶¶ 67–69.) But Plaintiff indicated in his Reinvent profile that, within two years, he aspired to work in "another channel within BP [], such as Indirect," or as a "Team Leader in a Sales Channel outside of Direct Sales." (*See* Def.'s Ex. A at \*32, ECF No. 70-3.) And, within three to five years, Plaintiff sought to work in a "Sales/Marketing Role" at BP. (*Id.*) BP transferred Plaintiff to a marketing role in the indirect sales channel, where he led other employees, which is what he asked for. That his new responsibilities were different or difficult does not reflect harm to his terms or conditions of employment. Next, "the loss of the use of a company car does not qualify as an adverse employment action." *Harley v. Geithner*, No. 07-3559, 2010 WL 3906642, at \*12 (D.N.J. Sept. 29, 2010). Finally, the change in Plaintiff's bonus structure does not reflect harm to the terms and conditions of Plaintiff's employment, considering his new position paid him considerably more (*see* DSMF ¶ 15), and BP gave him an additional bonus to "cover the difference" in bonuses between Sales and Marketing (Pl. Dep. at 89:3–11). "Without some evidence from which a reasonable factfinder could conclude that [Plaintiff's marketing]

14

position is inferior to, rather than merely different from, [Plaintiff's sales] position, [Plaintiff] has failed to create a genuine issue of material fact as to whether [he] suffered an adverse employment action."[9] *Langley*, 186 F. App'x at 261.

Consequently, the Court **grants** Defendant's motion for summary judgment as to Plaintiff's claims for age discrimination.

### C.    Disability Discrimination

The *McDonnell Douglas* framework governs ADA and NJLAD disability discrimination claims. *See Mascarenhas v. Rutgers, State Univ.*, 412 F. Supp. 3d 500, 507 (D.N.J. 2019) (ADA); *Stouch v. Township of Irvington*, 354 F. App'x 660, 667 n.4 (3d Cir. 2009) (NJLAD).

#### i.    *Prima Facie Case*

To state a claim for disability discrimination under the ADA or NJLAD, Plaintiff must show: "(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination." *Mascarenhas*, 412 F. Supp. 3d at 508 (quoting *Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 580 (3d Cir. 1998)). *See also Guarneri v. Buckeye Pipe Line Servs. Co.*, 205 F. Supp. 3d 606, 614 (D.N.J. 2016) ("Disability discrimination claims under the NJLAD and the ADA are analyzed under the same framework.").

Plaintiff argues that (1) his anxiety and major depressive disorders constitute disabilities, (2) he could do his job with or without reasonable accommodation, and (3) BP reduced his bonus and fired him because of his disabilities. (*See* Pl. Opp'n at 22–28.) BP counters that (1) Plaintiff is

---

[9] Additionally, because Plaintiff indicated to BP during the reorganization that he sought a sales or marketing role in the indirect sales channel as a team leader, Plaintiff cannot show his age was the "but-for" cause of his transfer to that exact kind of position.

not disabled under the ADA or NJLAD, and (2) no causal connection exists between Plaintiff's disability and BP's decisions to reduce his bonus or fire him.

### a.    Bonus Reduction

Plaintiff's disability discrimination claim fails because, even assuming he had a qualifying disability, there is no evidence in the record tying Plaintiff's disability to BP's decisions to reduce his bonus. "[T]he ADA only requires but-for causation." *Durham v. Kelley*, 82 F.4th 217, 226 (3d Cir. 2023). Plaintiff "must prove that they were treated differently based on the protected characteristic, namely the existence of their disability." *CG v. Pa. Dep't of Educ.*, 734 F.3d 229, 236 (3d Cir. 2013). The existence of an alternative cause for an adverse employment action is not fatal to an ADA claim so long as the disability "played a role in the . . . decisionmaking process and . . . had a determinative effect on the outcome of that process." *Id.* at 236 n.11 (quoting *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 300 n.4 (3d Cir. 2007)).

Here, no such evidence exists. To start, BP's Annual Cash Bonus Policy provides that bonuses "shall be prorated to exclude the number of calendar days" that an employee takes unpaid leave. (DSMF ¶ 101.) "Shall," "designates a BP requirement." (*See* Def.'s Ex. E ("BP Annual Cash Bonus Policy") at 5, ECF No. 70-10 at *41.) And the policy provides that Annual Cash Bonus payments "*shall* be made no later than the" March 15 payroll. (*Id.* at 9.) It is undisputed that Plaintiff took forty-eight days of unpaid leave. (DSMF ¶ 95.) According to the mandatory terms of the Annual Cash Bonus policy, those forty-eight days were excluded from Plaintiff's bonus.

Faced with the terms of the Annual Cash Bonus policy, Plaintiff claims his disability caused the reduction of his bonus because Plaintiff "still had an appeal pending from [Sedgwick's] unpaid leave [determination] while this was deducted from [his] bonus." (Pl.'s Second Dep. at 50:20–22, ECF No. 69-6.) But Plaintiff's pending appeal with Sedgwick, a third-party leave

16

administrator,[10] has no bearing on a bonus policy that operates under mandatory terms and requires bonuses to be paid after the March 15 pay period. This "scintilla of evidence" is insufficient to connect the bonus decision to Plaintiff's disability such that his claim survives summary judgment. *Anderson*, 477 U.S. at 252.

### b.    Termination

Likewise, Plaintiff offers no evidence that Plaintiff's disability "played a role in the . . . decisionmaking process" surrounding his termination or "had a determinative effect on the outcome of that process." *CG*, 734 F.3d at 236 n.11. Plaintiff points to four instances where he claims BP engaged in "hostile and antagonistic conduct" in response to the disclosure of his disabilities: (1) that BP acknowledged receipt of Plaintiff's request for an accommodation, but did not respond for over a year; (2) that BP demanded Plaintiff repay BP for the period of leave where his STD benefits were denied; (3) that BP ignored Plaintiff's internal complaint of discrimination in 2022; and (4) that BP "conducted a sham, one-sided investigation into [Plaintiff's] old expense reports to establish a basis for terminating his employment." (Pl.'s Opp'n at 27–28.) Plaintiff's claim that BP ignored an internal discrimination complaint is without support.

None of these instances, even taken together in a light most favorable to Plaintiff, raises a genuine issue of material fact tying Plaintiff's disability to his termination. To start, Plaintiff's manager immediately granted Plaintiff's accommodation request; BP confirmed the request in writing later. (DSMF ¶¶ 104, 106.) Next, it is unclear how BP's request for repayment was either hostile or antagonistic, considering that (a) BP paid Plaintiff for his entire period of leave while

---

[10] Similarly, Plaintiff offers no evidence connecting Sedgwick's decision to deny him STD benefits to BP's allegedly discriminatory conduct. Sedgwick is a third-party benefits administrator. To hold BP responsible for Sedgwick's denial, Plaintiff must "demonstrate that the employer has influenced or controlled the administrator's benefit decisions." *Merritt v. Int'l Bus. Machines Corp.*, No. 96-4495, 1997 WL 1136693, at *3 (D.N.J. Apr. 4, 1997). The record contains no such evidence.

Sedgwick's coverage decision was pending, (b) Sedgwick, a third party processor, determined that part of Plaintiff's leave was not covered, and (c) Plaintiff testified that BP did not commence any action to collect the overpayment. (*See* Pl.'s First Dep. at 218:23–219:2.) Third, Plaintiff's "internal complaint of discrimination" was an email that he sent BP, indicating he intended to appeal his STD denial, and alleging that the demand for repayment was due to his age and disability. (*See* Pl.'s Ex. 49, ECF No. 71-10.) Finally, there is no evidence that Plaintiff's disability was involved in or determinative of the decision to open an investigation into Plaintiff's expense reports. It is undisputed that BP's fraud detection tool flagged Plaintiff's expense reports, assigned him a risk score of over 900, and that BP conducts "a more in-depth review of employee expense reports with a risk score above 900." (DSMF ¶¶ 107, 115–18.) Nor is there any evidence that Serrano began investigating Plaintiff because of Plaintiff's disability. (*See, e.g.*, Serrano Dep.)

Accordingly, Plaintiff has failed to raise a genuine issue of material fact as to the causal connection between his disability and his termination. And, because Plaintiff has failed to establish a *prima facie* case of disability discrimination, the Court **grants** summary judgment as to Plaintiff's disability discrimination claims.

### D.    Failure to Accommodate

Disability discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112; *Victor v. State*, 203 N.J. 383, 407 (2010) (holding that NJLAD protects "reasonable accommodation rights for people with disabilities . . . in accordance with the sweeping protections of the ADA."). To state a failure to accommodate claim, Plaintiff must show: "(1) he was disabled and his employer knew it; (2) he requested an accommodation or assistance; (3) his employer did

not make a good faith effort to assist; and (4) he could have been reasonably accommodated." *Armstrong v. Burdette Tomlin Mem'l Hosp.*, 438 F.3d 240, 246 (3d Cir. 2006)

Here, Plaintiff alleges that BP failed to accommodate his disability by delaying the formal approval of his request to work from home once a week and, thus, "depriving him of the certainty and closure of knowing when he would face an environment that had led to major depression and anxiety disorder." (Pl.'s Opp'n at 30.) Yet Plaintiff's manager *informally* approved the request almost immediately. (DSMF ¶ 104; Pl.'s First Dep. at 234:25–235:2 (stating Plaintiff worked in-person "[m]aybe at least once a week.").) Moreover, Plaintiff's badge-swipe records show he physically entered the office only sixteen times between January and October 2023. (*See* Pl.'s Ex. C, ECF No. 70-10, at *22.[11]) Plaintiff's swipe record reflects that he generally[12] worked in person once a week or less.[13] That BP belatedly confirmed what Plaintiff's manager already allowed is irrelevant. What matters is that the record shows BP made a good faith effort to accommodate Plaintiff. *See Peifer v. Bd. of Prob. & Parole*, 106 F.4th 270, 278 (3d Cir. 2024) (concluding that "[b]ecause the Board provided [the plaintiff] the accommodation she requested . . . , [she] cannot establish the third element of her prima facie case, and the portion of her claim related to working from home must fail."). The Court, accordingly, **grants** summary judgment as to Plaintiff's failure-to-accommodate claims.

---

[11] Plaintiff disputes this fact, arguing Plaintiff's badge swipe records are "untitled" and "unauthenticated." (PRSMF ¶ 105.) This is unpersuasive. As discussed above, the Court may "consider unauthenticated documents or hearsay provided that the evidence *could* be made admissible at trial." *Blunt*, 767 F.3d at 295 n.66 (emphasis added). The badge swipe records could be authenticated at trial. Sarah Gillham, a BP employee with personal knowledge, declared that the badge-swipe records are authentic. And the fact that the records are Bates-stamped indicates they were produced in discovery and are probative of their authenticity.

[12] Plaintiff worked two days in person during the first week of March, four days in person during the third week of March, and two days in person during the fourth week of July. (*Id.*)

[13] Plaintiff worked fully remote between January 1, 2023, and February 20, 2023; April 19, 2023, and June 13, 2023; July 26, 2023, and August 28, 2023; and August 30, 2023, and October 13, 2023. (*Id.*)

### E.    Retaliation

Finally, Plaintiff alleges that BP retaliated against him for taking medical leave and suing BP by (1) reducing his bonus and (2) firing him. Courts apply the *McDonnell-Douglas* framework to retaliation claims. *See Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 257 (3d Cir. 2017).

### i.    *Prima Facie Claim*

To state a *prima facie* retaliation claim under the ADA, ADEA, FMLA, or NJLAD, Plaintiff must show (1) he engaged in a protected activity; (2) he suffered an adverse action; and (3) a causal connection exists between the protected activity and the adverse action. *Marsh v. GGB, LLC*, 455 F. Supp. 3d 113, 126 (D.N.J. 2020) (ADA and NJLAD); *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 301–02 (3d Cir. 2012) (FMLA); *Culler v. Sec'y of U.S. Veterans Affairs*, 507 F. App'x 246, 250 (3d Cir. 2012) (ADEA).

### a.    Protected Activity

Plaintiff alleges he engaged in two protected activities: taking FMLA leave and filing a discrimination lawsuit. Invoking the right to FMLA leave is a protected activity. *Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 256 (3d Cir. 2014). So is filing a lawsuit alleging an employer has engaged in an illegal discriminatory practice. *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015) (noting that protected activity includes formal and informal protests of discriminatory employment practices).

### b.    Adverse Employment Action

Termination and the reduction of a bonus are both adverse employment actions. *Fowler*, 19 F.4th at 300–01 (noting that mere notice of termination is adverse); *Dzibela v. BlackRock Inc.*, No. 23-2093, 2024 WL 4349813, at *9 (D.N.J. Sept. 30, 2024) (finding "reduced or stagnant compensation is an adverse employment action.").

####                c.        Causation

Courts "consider 'a broad array of evidence' in determining whether a sufficient causal link exists to survive a motion for summary judgment." *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007) (quoting *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 284 (3d Cir. 2000)). "Where the temporal proximity between the protected activity and the adverse action is 'unusually suggestive,' it is sufficient standing alone to create an inference of causality and defeat summary judgment." *Id.* Where temporal proximity is not "unusually suggestive," the Court considers whether "the proffered evidence, looked at as a whole, may suffice to raise the inference" of causation. *Id.* "Among the kinds of evidence that a plaintiff can proffer are intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated reasons for terminating the employee, or any other evidence in the record sufficient to support the inference of retaliatory animus." *Id.* at 232–33

Here, there is no "unusually suggestive" temporal proximity between the protected activities and the adverse employment actions. Plaintiff took medical leave from July 2022 to September 2022 and sued BP in December 2022. BP reduced Plaintiff's bonus in March 2023 and fired him in October 2023. *Id.* at 233 (stating "a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment.").

Nor does the proffered evidence, viewed as a whole, raise the inference of causation. As discussed above, the Annual Cash Bonus policy *required* BP to reduce Plaintiff's bonus by the amount of time he took unpaid leave. Just as the denial of Plaintiff's bonus could not give rise to causation in a disability discrimination claim, it similarly fails in a retaliation context.

Similarly, the facts surrounding Plaintiff's termination do not permit a factfinder to infer causation. At the threshold, BP's fraud detection tool flagged Plaintiff's suspicious expense reports in February 2022, five months *before* Plaintiff took medical leave. (*See* Investigative Report ¶ 1.) BP reviewed the expense reports in more depth by September 2022. (*See id.* ¶¶ 1–3.) Plaintiff filed his first EEOC charge two months *later* and sued a month after that. An employer "proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001).

BP's Disciplinary Policy provides that "[i]nstances of allegations of failure to comply with required conduct rules and regulations that could lead to formal discipline *will require an investigation*." (*See* Pl.'s Ex. 41 ("BP Disciplinary Policy") at *88, ECF No. 71-9.) It is undisputed that BP's Code of Conduct and Expense Policy require accurate expense reporting, and that failure to comply "through the deliberate and willful falsification of expense records or claims, misuse of the corporate card, participation in any other fraudulent or deceptive action" could result in dismissal. (DSMF ¶¶ 196–202.) Thus, BP flagging and intensively reviewing Plaintiff's expense reports before Plaintiff filed an EEOC charge or complaint suggests BP was "proceeding along lines previously contemplated" when it later investigated the reports for fraud and terminated Plaintiff based on the outcome of the investigation. *Gladysiewski v. Allegheny Energy*, 398 F. App'x 721, 724 (3d Cir. 2010) ("Here, the existence of the performance improvement plan suggests that [the employer] was 'proceeding along lines previously contemplated' when it terminated [the employee]."); *Chaoying Geng v. PNC Fin. Servs. Grp., Inc.*, No. 13-004, 2014 WL 3778299, at *13 (D.N.J. July 31, 2014) ("While Plaintiff was not terminated until November 26, 2012, it is clear that [Defendant] was investigating Plaintiff's check-cashing violations and contemplating discipline before she complained of discrimination.").

22

Nevertheless, the other arguments Plaintiff makes to connect his protected activity to his termination are insufficient to withstand summary judgment. First, Plaintiff notes that the in-house attorney overseeing Plaintiff's discrimination case "maintained communication with Mr. Serrano throughout his entire investigation; she was present during discussions about the outcome of [the] investigation; and she was present during the meeting where the decision to terminate [Plaintiff] was made." (PSMF ¶ 123.) But Plaintiff identifies no evidence in the record showing that the in-house attorney (a) opened the investigation because Plaintiff sued BP, (b) dictated the outcome of the investigation, or (c) had any meaningful involvement in the meeting to terminate Plaintiff. In-house attorneys provide legal advice and attend meetings on behalf of the corporation they represent. And, in any event, BP's Disciplinary Policy recommends that the decisionmaker and investigator should consult with legal counsel in disciplinary actions. (*See* BP Disciplinary Policy at *85.) Plaintiff offers no evidence, other than surmise, to bridge the gap between the in-house lawyer's duties and retaliatory animus.

Next, Plaintiff claims BP "deviated drastically from its established policies for administering employee discipline." (Pl.'s Opp'n at 32.) According to Plaintiff, "an employee's first or second-level manager is supposed to decide what, if any, discipline to issue for alleged code of conduct violations." (*Id.*) But here, Plaintiff claims BP "intentionally outsourced" decision-making authority to a high-level executive from the United Kingdom ("U.K. Executive"). (*Id.*) Plaintiff further claims the U.K. Executive did not consider Plaintiff's "track record with BP and any prior history of discipline (or lack thereof)," as she was required to do. (*Id.*) Plaintiff's reliance on BP's Disciplinary Policy, however, is misplaced. The Policy states the decisionmaker should be an "appropriate and objective member of management" who is "generally one to two levels above the subject of the investigation within the chain of command." (BP Disciplinary

23

Policy at *88–89.) BP considered the U.K. Executive an "appropriate and objective member of management" to avoid any potential conflict of interest because she did not know Plaintiff, and she was two levels above him. (*See* Def.'s Ex. K ("Komoroski Dep.") at 60:6–68:22, ECF No. 69-8.) That BP complied with its own Disciplinary Policy, albeit in a manner Plaintiff objected to, offers no evidence of causation.[14]

Finally, Plaintiff argues he was terminated because of his lawsuit, as at least three people who attended the meeting to terminate Plaintiff knew about it. (Pl.'s Opp'n at 35.) But there is no evidence that those individuals recommended termination because of the lawsuit, discussed the lawsuit at the meeting, displayed any retaliatory animus or hostility towards Plaintiff, or did anything else that would provide the factfinder with sufficient evidence to link Plaintiff's lawsuit to his termination.

Because the factfinder could not infer causation on this record, and because BP laid the groundwork for investigating and terminating Plaintiff months before he took any protected action, Plaintiff cannot state a *prima facie* retaliation claim. The Court, therefore, **grants** summary judgment on Plaintiff's retaliation claims.

---

[14] Plaintiff's other arguments surrounding the U.K. Executive fare no better. First, Plaintiff's assertion that the U.K. Executive did not consider his previously infraction-free record lacks evidentiary support. To the contrary, the U.K. Executive assumed Plaintiff had no prior disciplinary incidents. (Def.'s Supp. Ex. E at 77:16–20, ECF No. 73-4.) Second, Plaintiff alleges the U.K. Executive knew about the lawsuit. (Pl.'s Opp'n at 34–35.) That has no support in the record either. The U.K. Executive testified she was made aware that another employee could not serve as Plaintiff's decisionmaker because of "some kind of Lawsuit going on," but thought the lawsuit was between that employee and BP, not Plaintiff and BP. (Def.'s Ex. J ("Del Ray Dep.") at 21:13–22, 25:7–20, ECF No. 69-8.) Plaintiff argues, without any evidence, that the U.K. Executive's "denial of knowledge of this litigation is simply not plausible." (Pl.'s Opp'n at 34.) However, the Court cannot make credibility determinations on a motion for summary judgment and declines Plaintiff's invitation to do so. *Rhodes*, 302 F. Supp. 3d at 661.

### ii.    Pretext

Even if Plaintiff had established a *prima facie* retaliation claim, the Court would nonetheless grant BP's summary judgment motion because there is no evidence that BP's reason for terminating Plaintiff was pretextual.

As discussed above, if Plaintiff alleges a *prima facie* retaliation claim, "the burden shifts to defendant to articulate a 'legitimate nondiscriminatory' reason for the adverse employment decision." *Lawrence*, 98 F.3d at 66. Here, BP has a legitimate, non-discriminatory reason for firing Plaintiff—the company found that he submitted fraudulent duplicate expense reports 11 times and concluded that his explanation was implausible.

So, the burden shifts back to Plaintiff to "demonstrate that the employer's stated reasons were not its true reasons but were a pretext for discrimination." *Sempier*, 45 F.3d at 728. The plaintiff may do so "either: (1) by discrediting the proffered reasons for termination, directly or circumstantially, or (2) by adducing evidence that discrimination was more likely than not a motivating or determinative cause of the adverse action." *Lawrence*, 98 F.3d at 66. "[T]o avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that *each* of the employer's proffered non-discriminatory reasons, was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994) (citations omitted). Plaintiff "cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Id.* at 765. Plaintiff must instead "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a

25

reasonable factfinder *could* rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'" *Id.* (citations omitted).

Plaintiff argues the fraud investigation was pretext to fire Plaintiff because (1) Serrano's investigation was flawed, and (2) BP did not fire other employees who had similar billing issues. The Court considers each point in turn.

The first argument—that Serrano's investigation was flawed—does not show pretext. Plaintiff claims Serrano's report overlooked that Plaintiff repaid some of the money, and that Concur had technical glitches that could cause Plaintiff's expense reports to incorrectly appear as duplicate charges. (*See* Pl.'s Opp'n at 37–38.) However, to show pretext, Plaintiff "cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Fuentes*, 32 F.3d at 765. So, even if Serrano's investigation was flawed and his conclusion was wrong, at best, that potentially shows incompetence, not discriminatory animus.

The second argument—that similarly situated employees investigated for duplicate expense reports were not fired—does not show pretext. To be sure, "evidence that defendant treated 'similarly situated' individuals not within plaintiff's protected class more favorably than it treated plaintiff" may give rise to the inference of discrimination. *Phillips v. Starbucks Corp.*, 624 F. Supp. 3d 530, 540 (D.N.J. 2022) (quoting *Darby v. Temple Univ.*, 216 F. Supp. 3d 535, 542 (E.D. Pa. 2016)). "[C]omparator employees need not be identical but must be similarly situated in 'all material respects.'" *Qin v. Vertex, Inc.*, 100 F.4th 458, 474 (3d Cir. 2024) (quoting *In re Tribune Media Co.*, 902 F.3d 384, 403 (3d Cir. 2018)). The factors that make a comparator "similarly situated" depend on the case, but "often includes a showing that the two employees

26

dealt with the same supervisor, were subject to the same standards, and engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Wills v. CulinArt Grp.*, No. 23-23139, 2026 WL 63508, at *5 (D.N.J. Jan. 8, 2026) (quoting *Garrow v. Wells Fargo Bank, N.A.*, No. 15-1468, 2016 WL 5870858, at *4 (E.D. Pa. Oct. 7, 2016)). "Whether employees are similarly situated is generally a question of fact for the jury, but summary judgment may be appropriate where there is no evidence from which a jury could conclude that the comparators were similarly situated." *Id.*

Plaintiff asserts that "out of the seven other US employees that were investigated for similar issues (duplicate expenses), not one was terminated."[15] (Pl.'s Opp'n at 38–39.) Not so.

Four of the seven employees did not submit duplicate expense reports for credit and cash reimbursement. One booked two different hotels on the same day (Pl.'s Ex. 39 at *42–45); the second did not submit receipts with high value purchases (*Id.* at *56–61); the third paid for another employee's dinner on his corporate card (*Id.* at *46–50); the fourth incorrectly submitted invoices for two hotel stays, neither of which was a duplicate. (*Id.*) These four employees, accordingly, did not engage in conduct like Plaintiff's.

Two employees were still under investigation when their reports were produced in discovery. One submitted four duplicate expenses between 2019 and 2022, totaling $2353.58. (Pl.'s Ex. 37, ECF No. 71-9.) The other submitted six duplicate expenses, totaling $413. (Pl.'s Ex. 39 at *62–66.) While BP assigned Serrano to investigate this employee, BP did so *after* Plaintiff was already terminated. (*Id.*) Accordingly, a juror could not conclude BP treated these employees differently, because they were still being investigated.

---

[15] The Court notes, however, that Plaintiff provided investigation reports

27

The remaining employee submitted duplicate expense reports, but under such different circumstances that a reasonable juror could not view their conduct as similar to Plaintiff's. That employee submitted four duplicate expense reports in 2019. (*Id.* at *51–55.) BP concluded that "[d]ue to the excessive time passage of this expense duplication from 2019 and no indication of any further occurrences indicating malicious intent, but rather the incidents were isolated to the time period when the employee first joined [BP]." (*Id.* at *54.) BP required the employee to undergo coaching. (*Id.* at *51.) In this case, by contrast, Plaintiff submitted eleven duplicate expense reports across two years; did so well into his tenure at BP; and offered evasive, inconsistent, or contradictory explanations for the charges, leading the investigator and decisionmaker to conclude Plaintiff's conduct was intentional and would continue. Plaintiff's "comparator evidence" thus cannot create a genuine issue of material fact as to pretext.

In sum, even if Plaintiff had stated a *prima facie* case of retaliation, BP had a legitimate non-discriminatory reason for terminating him, which Plaintiff fails to show was pretextual. Consequently, the Court **grants** BP's motion for summary judgment as to Plaintiff's retaliation claims.

## IV.    CONCLUSION

For the foregoing reasons, BP's motion for summary judgment (ECF No. 69) is **GRANTED**. An appropriate Order accompanies this Opinion.

DATED: 3/23/2026

JULIEN XAVIER NEALS
United States District Judge

28